### In re McKENNA'S WILL.

(*Surrogate's Court, New York County. May 7, 1888.*)

1. **WILLS—EXECUTION.**

   The lawyer who prepared decedent's will testified that he drew the will according to directions, read it to decedent, and asked him if it was right, and decedent said that it was; that a third person was then called in as a witness, and the lawyer told decedent to sign the will in their presence, which he did; that the decedent was then asked if he signed, sealed, published, and declared the paper to be his will, and requested them to sign their names as witnesses, and he said, "I do;" that the witnesses then signed their names and residences; and that he then handed the will to decedent's wife. The other witness contradicted some of this testimony, but she manifested much hostility to the proponent, and admitted that she did not at the time regard the matter as of any importance. *Held*, that the will was properly executed.

2. **SAME—UNDUE INFLUENCE.**

   On the issue of whether the execution of the proposed will was decedent's free and voluntary act, the lawyer testified that he was called by the family physician to go to decedent's house and draw his will. That when he asked decedent how he wanted it drawn, and whom the property was to go to, decedent's wife replied: "Everything is to go to me,—every dollar. The money was earned through me as much as through him. Everything is to go to me." That he asked the decedent if that was so, and he said, "Yes." That he drew the will according to those instructions and read it to the decedent, who responded that it was right. There was evidence that decedent and his wife often quarreled, and that he had, on several occasions, in fits of anger, threatened to leave her as little of his property as possible, (they had no issue;) but it also appeared that she had for years been very active and helpful in his business, and that when his next of kin applied to him for aid he had replied that they ought to work for their money as he and his wife had done, and that he should never do any more for them. There was evidence that immediately after the execution of the will he expressed himself as dissatisfied with it, but he lived several weeks thereafter, retaining his faculties, and made no effort to have it changed. *Held*, that the evidence was insufficient to impeach the will.

On application to admit to probate the will of James McKenna, deceased. *Thomas McAdam*, for proponent. *Tierney & Hakey*, for next of kin.

RANSOM, S. The will of the decedent was executed on the 25th day of April, 1887, at his residence, during the period of his last illness, from which he died in the month of June thereafter. It gives all his property, real and personal, to his wife, Mary, and appoints her executrix. The circumstances

attending the preparation and execution of the instrument, as testified to by Judge McAdam, who was the draughtsman, and one of the subscribing witnesses to it, are these: He received a message by telephone from Dr. Griswold, the attending physician, requesting him to go to the house of the decedent (who had been, in former years, his client) to draw his will. He met Mrs. McKenna, then for the first time, in their store, and was conducted by her to the decedent's room, where he asked him how he wished the will drawn, and to whom his property was to go. Mrs. McKenna said: "Everything is to go to me,—every dollar. The money was earned through me as much as through him. Everything is to go to me." He asked the decedent if that was so, and he replied, "Yes." Judge McAdam then left, and shortly after returned, with the will drawn according to the instructions, and he read it to him, and asked him if it was right, and the decedent said, "Yes." Judge Mc-Adam inquired if there was any one in the house to act as a subscribing witness with him, and Mrs. McKenna said, "Yes," and called in Mrs. Grimes. He then told McKenna, who was sitting in a chair, to sign the will in their presence, and he did so. He asked the decedent if he signed, sealed, published, and declared the paper to be his will, and requested them to sign their names as witnesses, and he said, "I do." The witnesses then signed their names and residences, and he handed the will to Mrs. McKenna. He stated that the decedent was sick at the time, but he did not think that his mind was affected. Mrs. Grimes, the other subscribing witness, who throughout her testimony evinced a hostile feeling towards Mrs. McKenna, in testifying to the facts connected with the execution of the instrument, stated that the decedent did not say what the paper was, nor did she hear Judge McAdam question him; and, further, that she signed it at Judge McAdam's request, and did not see Judge McAdam sign it; that the judge asked the decedent to sign the will, and he hesitated, and looked at the judge, and that the judge said to him: "There is no harm to sign it. I have made my will long ago." In respect to this last statement of Mrs. Grimes, Judge McAdam stated, on being recalled, that, as he was about to leave the decedent, he said to him that he was a sick man, and that he hoped that he would have no occasion to use the will, and that he would get better. He also stated, without objection, that he had, in the course of his 29 years' experience at the bar, drawn at least 200 wills, and, further, that he read the attestation clause at the time of the execution of the instrument in the presence of Mrs. Grimes. But Mrs. Grimes admitted in her testimony that she did not regard the matter at the time as of any importance to pay particular attention to it, as she did not suppose there would be any difficulty about it. This last consideration alone is sufficient reason for disregarding her testimony, in so far as it conflicts with the statement of Judge McAdam, to say nothing of the *animus* manifested by her in respect to Mrs. McKenna throughout her entire testimony. I have no doubt that the will was properly executed. Objections were filed against the probate of the instrument by the special guardian of certain minors, and by other next of kin, alleging a want of testamentary capacity by the decedent, and that its execution was not his free, unconstrained, and voluntary act. On this last issue the circumstances connected with the preparation and execution of the instrument have a legitimate bearing. Mrs. McKenna, the sole devisee and legatee, gave the instructions in reference to the disposition of the estate, and the decedent, being questioned to know if such was his wish, made an affirmative answer. As I hold that the instrument was properly executed, the fact that Mrs. McKenna dictated its terms is important to be considered, if there are other proofs to show that it reflects her wishes, and not her husband's. To determine this question it is necessary to ascertain the relations of the parties throughout their marital career, and investigation discloses the fact that at times they were very discordant.

The testimony of the witnesses, both for the proponent and contestants,

points to frequent quarrels between them, in which they mutually applied epithets of a very offensive character, and sometimes indulged in threats, and even acts of moderate violence. Both were headstrong, and in full vigor of health, and impatient of restraint. The testimony in behalf of the proponent is to the effect that this quarrelsome disposition on the part of the decedent was only when he was under the influence of liquor; that of the contestants would tend to show that it was the wife who was the aggressive party. But all agree that the decedent was at times in an ugly frame of mind to all who came in contact with him. Lines were very strictly drawn between witnesses for the proponent and contestants. Each had an evident tendency to exaggerate. But the fact is undisputed that, at the time of his death, the decedent and his wife had been married for 15 years, both being of mature age at the time of their union, though the decedent was probably 15 years her senior, and that from the inception of their marital relations the wife had been an active helpmate in conducting the business, and in attending to the duty of caring for the property of which decedent died possessed. Both were thrifty and frugal in their habits, and by their joint efforts had increased the value of the estate until it was worth many thousand dollars. I find no warrant for believing that the discord was continuous, though the more zealous of contestants' witnesses have sought to convey that impression. The fact is proven that decedent and his wife rode out on Sundays when the weather was pleasant, and his declarations show that he appreciated her as an important auxiliary in the conduct of his affairs; and there is no evidence in the case to show that, during the protracted illness which ended in his death, there was any quarrel between them, and it was during this time that the instrument offered for probate was executed. There being no issue of their marriage, and the nearest of kin being a sister and nephews and nieces, the will giving to his wife his entire estate was not an unreasonable one, in view of the wife's active co-operation in the accumulation of the estate. But the declarations of the decedent in respect to his testamentary intentions vary, as testified to by opposing witnesses. According to Mrs. Grimes, he stated to her, after Judge McAdam had left the room at the time of the execution of the will, that she was not going to have her say about the will; and that once or twice before he had said he would not leave her anything, only that which he could not help. McGuire testified that the decedent said he would not leave his wife anything, but the statement was made when they had had a quarrel. Mr. Grimes stated that the decedent said that there were plenty to get his property after his death, and he especially mentioned a sister in Boston, who had encouraged him to go into business. Cannon, a nephew and contestant, testified, without objection, that the decedent told him once that he (the nephew) would have his name over the door, intending thereby to intimate a purpose to leave the nephew the business that he was carrying on. On the other side, Mrs. Getty and Mr. and Mrs. Wilson and Mrs. Gattman testified to declarations of the decedent finding fault with his relatives by reason of their constantly getting money of his, and speaking of them in an opprobrious manner in that connection, and saying that they ought to work for their money as he and his wife had done, and that he should never do any more for them. McGuire, the husband of one of the contestants, admitted that he had borrowed money of the decedent that he had never paid. These inconsistent declarations of the decedent may be explained by the suggestion that those against his wife, to whom he certainly owed a duty in view of her active efforts for 15 years in helping him with the business, were made in fits of anger, and those of indifference to his relations followed importunities on their part for pecuniary aid, while those in favor of his wife were made at a time when he was not under the influence of excitement. And in respect to the declarations of Mrs. McKenna that when her husband was dead she would have his money, and marry the man she loved; that she had got things fixed so that

the relatives would not get a cent; and that her husband would never make a will, and she did not care whether he did or not, if she would get her share; and that she only married him for his money,—they were doubtless made in fits of passion or impatience, and are not of much value in the efforts to support the contest. It is evident that Mrs. McKenna did not entertain cordial feelings towards the decedent's relatives, and she did not regard kindly his gifts of money to them, or his desire to entertain them on their visits to the city.

Proofs have been adduced to show the exclusion of Cannon and McGuire, the one a nephew and the other the husband of a niece of the decedent, from his apartments during his last illness, but it does not seem to have been effective, for both were admitted to his presence, except on one occasion, and certainly such an exclusion does not raise the presumption of a systematic effort in that direction. The slight testimony given to show that the decedent was neglected by his wife, or that he was not well fed, was abundantly met by proponent's proofs. She was necessarily at the store during his sickness, attending to the business there, but the evidence shows that the decedent was cared for night and day by others whom she employed for that purpose; and when in health he had an abundance of substantial food, and during his final sickness was furnished with everything he wished, and it was difficult to get him to take as much nourishment as his system required. The statements of his being allowed to remain in an unclean condition were disproved by the laundress, who testified that she washed for him over a dozen shirts and undershirts each week, which became quickly soiled by the expectoration, the consequence of his disease, consumption, and that as they became soiled they were changed. The declaration of the decedent to Miss McNally, that his wife had told him that her mother had poisoned her father, and he was afraid she would poison him to get his money; and, on another occasion, that he was glad Miss McNally was not married; that it was all a humbug; that he had enough of it; that he had plenty of money, and could have remained single; and the declaration to Cannon that he was afraid there was poison in a pot of tea which his wife had prepared,—when considered in connection with the whole case, indicate nothing more serious to my mind than passing suspicions, possibly following family jars. There is no testimony in the case to disprove the statement of Judge McAdam that the mind of the decedent, at the time he executed the will, was unaffected. The testimony of Dr. Griswold, who, on cross-examination, was examined as an expert by contestants' counsel, was that the mental power and vigor of persons suffering from consumption of the lungs was better than in a great majority of diseases, though, with the progress of the disease, the mind would be likely to become gradually weakened. But the decedent lived several weeks after the execution of the instrument, and nothing was adduced to show that at any time previous to his death he was incompetent to make a disposition of his property. In view of the circumstances attending the giving of the instructions by his wife, the sole legatee, for the making of the will, and of the discordant relations sometimes existing between herself and husband, there was no reason for the next of kin to initiate the contest; but on the facts disclosed in the proofs I am satisfied that the instrument reflects the decedent's wishes. It is impossible to believe that Judge McAdam would have drawn and superintended the execution of and witnessed the will unless he had been thoroughly convinced, as an experienced lawyer, that it represented the decedent's testamentary purposes. Even if it be true that the decedent did make declarations after the execution tending to show that its terms were not altogether satisfactory to him, in the succeeding weeks he could have executed another instrument. It was not done, and hence the instrument must stand. A decree may be prepared accordingly.